# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

EDWARD NOBLE, §
§
    *Plaintiff,* §
§
*versus* §    CIVIL ACTION NO. 7:13-1443
§
CAROLYN W. COLVIN, §
Acting Commissioner of §
Social Security, §
§
    *Defendant.* §

## REPORT AND RECOMMENDATION

Edward Noble ("Noble") seeks review of an adverse decision on his applications under the Social Security Act for disability insurance and supplemental security income benefits.[1]

## I. Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when substantial evidence supports the decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Neither

---

[1] Disability Insurance, authorized by Title II of the Social Security Act and funded by social security taxes, provides income to insured individuals forced into involuntary, premature retirement by reason of disability. Supplemental Security Income, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provides an additional resource to assure that disabled individuals' incomes do not fall below the poverty line.

can they overturn administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order).

## II. Background

*A. Personal*

Noble, born in 1955, has a history of depression, suicidal ideation and schizophrenia dating back to his early teens. (T. 458-59). At age 16, Noble abused alcohol, marijuana, prescription and non-prescription compounds (*e.g.*, "reds," "black beauties," "downers," and "speed"), and LSD. (T. 458). Between the early-1970's until close to 1980, Noble was in and out of a psychiatric hospital, St. Lawrence Psychiatric Center. (*Id.*). After several relapses, he reached and has maintained sobriety for 20 years. (*Id.*). Since 1992, Noble has received counseling and medication management for depression at the Mental Health Clinic at St. Lawrence County Community Services. (T. 459, 556).

Noble's work history began with general labor on a family dairy farm. (T. 460). He also worked in various positions at a supermarket and at a veterinary clinic cleaning cages. (*Id.*). In 1998, he began work at the Board Of Cooperative Educational Services ("BOCES") as a teaching assistant and job coach. (*Id.*). In September, 2006, at age 51, while employed at BOCES but helping out at the family farm, Noble had a left-sided cerebrovascular accident ("CVA" or stroke). (T. 413, 432). He experienced slurred speech, right side facial droop, as well as right upper extremity paresis. (T. 403). Thereafter, he received rehabilitation services (physical, occupational, and speech therapy) to address activities of daily living, independent activities, and activity reintegration. (T. 403-04). In late-November, 2006, he returned to work. (T. 414). After

returning, his job performance declined in 2007-08. (T. 461). He stopped working in June, 2008. (T. 297)

*B.    Claim*

Noble applied for disability insurance benefits and supplemental security income due to "depression, stroke, and high cholesterol," commencing June 25, 2008. (T. 297). His height was listed at 5'8", and he weighed 245 pounds. (T. 296). In June, 2010, an evidentiary hearing was held before an administrative law judge, John P. Ramos ("ALJ Ramos"). (T. 30, 48-71). ALJ Ramos denied Noble's claims for benefits, and Noble sought review with the Appeals Council. (T. 30, 124-34, 186-194).

By order of the Appeals Council, dated May, 2011, ALJ Ramos's decision was vacated and remanded for further review. (T. 140-42). The Appeals Council directed than an administrative law judge further evaluate the severity of Noble's obesity, and assess the effect it has on his ability to perform work-related activities. It also directed further consideration of Nobel's maximum residual functional capacity and receipt of evidence from a vocational expert to clarify the effect of Noble's assessed limitations on his occupational base. (T. 140-41).

Upon remand, the matter was reassigned to ALJ Ramos who held new hearings in July, 2011 and March, 2012. (T. 72-102, 103-118). Noble and his legal counsel appeared at both. (*Id.*). Marla Neiderer (Noble's supervisor at his last job) and Patricia Noble (Noble's wife) testified at the July, 2011 hearing. (T. 78-89, 89-101). A vocational expert witness, Donald L. Schader, BA, MS ("VE Schader") testified at the March hearing. (T. 107-17, 227-28).

ALJ Ramos issued a new decision again denying Noble's applications on April 12, 2012. (T. 30-41). The Appeals Council denied Noble's request to review. (T. 1-7). Noble then instituted this proceeding.

# III. Commissioner's Decision[2]

At Step 2 of sequential evaluation, ALJ Ramos found that Noble has severe impairments of status post cerebrovascular accident with cognitive deficit and mild speech impediment, sleep apnea, and depression.  At Step 3, he found that none of these impairments are so severe as to be presumptively disabling under 20 C.F.R. Pt. 404, Subpt. P, App'x 1 (the "Listings").  (T. 33-34).[3]

ALJ Ramos next addressed Noble's "residual functional capacity."[4]  He found that, despite his severe impairments, Noble retains physical capacity to perform work at the medium exertional level with certain nonexertional limitations described in the note below.[5]  (T. 34-35).

---

[2]     When adjudicating Noble's claim, ALJ Ramos utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)).  A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[3]     ALJ Ramos also found that Noble's bipolar disorder with psychosis is a non-severe impairment.  (T. 33).  Noble does not challenge this finding.

[4]     Residual functional capacity is defined and discussed in Section VI.*A.*, *infra*.

[5]     ALJ Ramos assessed Noble's residual functional capacity as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift up to 50 pounds occasionally, lift or carry up to 25 pounds frequently in medium work as defined by the regulations; stand or walk for approximately 6 hours out of an 8 hour workday, and sit for up to 6 hours in an 8 hour workday with normal breaks; except he should avoid the use of dangerous machinery, working at heights, using ladder ropes, scaffolds, and should avoid frequent bending. The claimant also retains the ability to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/concentration for only simple tasks; regularly attend to a routine and maintain a schedule; can communicate with and relate to and interact appropriately with others to the extent necessary to carry out
(continued...)

At Step 4 of sequential evaluation, ALJ Ramos found that, Noble cannot perform his past relevant work as it exceeds his current mental residual functional capacity. (T. 39, 111). Next (at Step 5), ALJ Ramos found that a person with Noble's residual functional capacity can perform alternative work as a kitchen helper, dining room attendant, and a "cleaner II." (T. 40). When making this finding, ALJ Ramos relied on VE Schader's testimony. Finally, ALJ Ramos determined that Noble is not disabled under the framework of Medical-Vocational Rule 203.22 and 203.15.[6]  (T. 40, 111-12). Therefore, Noble's applications were denied. (T. 40).

## IV.  Points of Alleged Error

Noble's brief proffers three points of error:

1.   The Commissioner failed to find Plaintiff's impairment or combination of impairments meet or medically equal the severity of Listings 12.02 and 12.04;

2.   The Commissioner failed [to] properly follow the treating physician rule; and

3.   The Commissioner failed to properly assess Plaintiff's residual function capacity.

(Dkt. No. 14, p. 3). Point 1 argues that ALJ Ramos erred when failing to find Noble presumptively disabled at Step 3 of sequential evaluation. Points 2 and

_____

[5](...continued)
```
simple tasks; and handle reasonable levels of simple, repetitive
work-related stress in a static environment requiring only
occasional simple decision making.
```

(T. 34-35).

[6]      The Medical Vocational Guidelines are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996).

3 argue that ALJ Ramos erred in various ways when establishing Noble's residual functional capacity.

## V. Alleged Step 3 Error (Point 1)

When administrative adjudicators determine (at Step 2) that claimants have severe impairments, they next decide (at Step 3) whether those impairments are disabling under 20 C.F.R. Pt. 404, Subpt. P, App'x 1 (the "Listings"). The Commissioner has published in the Listings a series of impairments describing a variety of physical and mental conditions, indexed according to the body system affected. *Listed impairments are presumptively disabling.* *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).

A "special technique,"sometimes referred to as a "psychiatric review technique" set out in 20 C.F.R. §§ 404.1520a(b)-(e), 416.920a(b)-(e) applies when mental impairments are at issue. *See Petrie v. Astrue*, 412 Fed. App'x 401, 403 (2d Cir. 2011) (summary order); *see also Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008) (describing analysis). This complex and abstruse technique helps administrative law judges determine whether claimants have medically-determinable mental impairments (by applying what commonly is called "A criteria"). It also enables administrative law judges to determine whether medically-determinable mental impairments are severe (a Step 2 issue) and whether they meet or are equivalent in severity to any presumptively disabling mental disorder (a Step 3 issue).

Administrative law judges make these latter findings by applying what commonly is called "B criteria" which relate to four functional areas: (1) "[a]ctivities of daily living;" (2) "social functioning;" (3) "concentration, persistence, or pace;" and (4) "episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). For the first three areas, administrative

judges provide ratings of "[n]one, mild, moderate, marked, [or] extreme." *Id.*, at §§ 404.1520a(c)(4), 416.920a(c)(4). For the fourth category (episodes of decompensation) administrative judges provides ratings on a five-point scale: "[n]one, one or two, three, four or more." *Id.*[7] In order to meet "B criteria," claimants' mental impairments must cause at least (a) two "marked" or "extreme" limitations (in the first three functional areas) *or* (b) one "marked" or "extreme" limitation (in the first three functional areas) *and* "repeated" episodes-of-decompensation (in the fourth functional area). *See* 20 C.F.R. pt. 404, Subpt. P, App'x 1, §§ 12.02(B), 12.04(B).

## A.    Findings

ALJ Ramos compared Noble's *mental* impairments (cognitive disorder and depression), to Listings 12.02 ("Organic Mental Disorders") and 12.04 ("Affective Disorders"). With respect to "B criteria," ALJ Ramos found that Noble has only mild limitations in activities of daily living, mild restrictions in social functioning, moderate difficulties with regard to concentration, persistence or pace, and no episodes of decompensation. (T. 34). Accordingly, ALJ Ramos found (at Step 3) that Noble's mental impairments do not meet or medically equal the severity of either of the mental-impairment Listings at issue.

## B.    Noble's Challenge

Noble submits that ALJ Ramos erred at Step 3 because clinical and treatment records satisfy each and every necessary element of Listings 12.02(A) and (B) and 12.04(A) and (B). (Dkt. No. 14, pp. 13-17). Noble's brief devotes considerable space to a discussion of the evidence supporting a finding that he

---

[7]     Administrative law judges generally conclude that claimants' mental impairments are not severe when they receive ratings of "none" or "mild" in each of the first three areas and "none" in the fourth area. *Id.*, at §§ 404.1520a(d)(1), 416.920a(d)(1); *Kohler*, 546 F.3d at 266.

satisfies "A criteria" for a medically-determinable mental impairment, but, since that is not in dispute, his primary argument ultimately focuses on "B criteria."

In that regard, Noble argues that ALJ Ramos should have found marked limitations in the areas of social functioning and maintaining concentration, persistence, or pace.[8] (*Id.*, p. 16). With respect to maintaining concentration, persistence and pace, Noble points to his wife's testimony that he only performs certain tasks with her guidance, and that he has to write everything down. (T. 93-94). He also cites testimony from his former supervisor at BOCES that Noble was unable to perform simple math (*e.g.*, calculate mileage), and needed reminders to follow through on things. (T. 81, 83). Lastly, Noble notes that Daniel Jenack, RPA-C ("PA Jenack") noted marked limitations in Noble's ability to understand and remember simple or complex instructions, ability to make judgments on simple and complex work-related decisions, and extreme limitations in his ability to carry out complex instructions, and that Antoine Gabriel, M.D., also checked "marked" limitations in this area. (T. 15, 574-75).

With respect to social functioning, Noble contends that ALJ Ramos "overlooks and diminishes" his cognitive limitations in engaging in social behavior. (Dkt. No. 14, p. 16). Noble cites an entry by PA Jenack in a September, 2010 medical report, stating that while Noble is generally pleasant with others, he has become reclusive and avoids social settings due to his insecurity about his anxiety and ability to communicate. (T. 575). He further cites to an entry in May, 2008 by his primary care physician noting that Noble felt embarrassed about his speech. (T. 409). His wife testified that when she tries to correct Noble's memory, he gets frustrated and retreats. (T. 96). Noble

---

[8] Noble does not challenge ALJ Ramos's findings regarding mild restrictions in activities of daily living or no episodes of decompensation for an extended duration. (Dkt. No. 14, pp. 15-17).

testified that although he still attends church, he is unable to be head usher, lead the prayer team, or visit "shut-ins" because he gets easily distracted and cannot follow instructions. (T. 58-60). Finally, Noble notes that Dr. Gabriel assessed him with "marked" limitations in this area. (T. 15).

## C.    Discussion

Noble's arguments are misdirected. Even if there were evidence from which ALJ Ramos could have found marked limitations in two functional areas, the governing circuit court of appeals recently explained that "whether there is substantial evidence supporting the [claimant]'s view is not the question." *Bonet ex rel. T.B. v. Colvin*, 532 Fed. App'x 58, 59 (2d Cir. 2013) (summary order). Rather, the court "must decide whether substantial evidence supports *the ALJ's decision*." *Id*. (emphasis in original).

"Substantial Evidence" is a term of art meaning less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 378, 401 (1978); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir.2004). To be "substantial," evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.*, 306 U.S. 262, 299–300 (1939) (cited in Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed. 1991)). Given this, Noble's irregular approach, *i.e.*, emphasizing evidence *supporting* her claim, can succeed only if there is *no contrary evidence* a reasonable mind might accept as adequate to establish factual findings made by ALJ Ramos.

1.  Social Functioning

ALJ Ramos determined that Noble has only mild difficulties in social functioning, noting that he stated he attends church twice a week and considered the idea of preaching. (T. 34, 512). Additionally, he reported no problems getting along with family, friends, or others. (*Id*.).

ALJ Ramos's findings are further supported by expert medical opinion evidence. Consultative psychologist, Jeanne Shapiro, Ph.D., upon examination found Noble was cooperative, and his manner of relating, social skills, and overall presentation was adequate. (T. 482). Dr. Shapiro noted his mood was calm, and he appeared relaxed and comfortable. (*Id*.). Noble reported to Dr. Shapiro that he took care of his kids, got along well with friends and family, and went to church regularly. (T. 482-83). *Dr. Shapiro concluded that Noble was capable of relating to and interacting with others.* (T. 483).

Similarly, consultative neurologist, Justine Margurno, M.D., noted upon examination that Noble was dressed appropriately, maintained eye contact, his mood and affect were appropriate, and insight and judgment were good. (T. 491-92).

In October, 2008, PA Jenack, a long-term provider, reported that Noble had no limitations for social functioning on a form submitted to New York State Office of Temporary and Disability Assistance. (T. 478). His subsequent treatment note recording that Noble is embarrassed about his speech, withdraws from certain activities and reports limitations in social functioning does not depict marked limitations.

Finally, nonexamining psychological consultant "H. Ferrin, Psychology" opined that Noble has only mild limitations in social functioning in a January

2009 Psychiatric Review Technique form. (T. 506). And, in a Mental Residual Functional Capacity Assessment, Dr. Ferrin found "no evidence of limitation in this category" in relation to Noble's ability in the area of social interaction. (T. 511). Additionally, in a narrative review of the evidence of record, Dr. Ferrin noted that Noble "[r]eports no problems with getting along with family, friends, or others, but does report not enjoying social activities anymore." (T. 512).

Clearly, substantial evidence supports ALJ Ramos's finding that Noble has only mild limitations in social functioning.

### 2. Concentration, Persistence or Pace

ALJ Ramos determined that Noble has moderate limitations with respect to concentration, persistence and pace. He noted Noble's testimony that he pays household bills and is capable of managing money. (T. 34, 65-66).

At the December 2008 consultative psychiatric examination by Dr. Shapiro, Noble was able to remember three of three words immediately, and his judgment and insight were found by Dr. Shapiro to be good. (T. 34, 482). Additionally, Dr. Shapiro found that Noble's cognitive functioning was in the average range, *and that he was capable of maintaining attention and concentration.* (T. 482-83).

Dr. Magurno noted that, upon examination in December 2008, Noble's memory was good and he appeared oriented to time, person, and place. (T. 492). Similarly, Dr. Ferrin, opined that Noble can sustain attention and concentration for tasks and only had mild limitation in concentration, persistence or pace.[9]

---

[9] Dr. Ferrin's opinion that Noble exhibits mild limitations in concentration, persistence and pace is less severe than ALJ Ramos's finding of moderate limitations. ALJ Ramos gave Dr. Ferrin's opinion less weight because he considered it as being inconsistent with the overall weight of the evidence. (T. 34).

In March 2009, PA Jenack reported Noble as "doing quite well." (T. 562). He further reported Noble did not seem to be having any major problem with his social security application and the filling out of the application. (*Id*.). "His biggest complaint now is that he is waiting." (*Id*.).

Clearly, substantial evidence supports ALJ Ramos's finding that Noble has no more than moderate limitations in concentration, persistence or pace.

3.    <u>Conclusion</u>

ALJ Ramos cited and applied the "special technique" established by regulations for assessing whether mental impairments are of such severity as to meet or medically-equal the requirements of a mental-disorder Listing of a presumptively-disabling impairment. His findings that Noble's limitations do not rise to the level of "marked" or "repeated" in any of the "B criteria" functional areas are supported by substantial evidence. There is no basis to reverse on the ground of a Step 3 error.

## VI. Alleged Residual Functional Capacity Errors (Points II & III)

Noble's second and third points of error challenge ALJ Ramos's residual functional capacity assessment. *See* note 5, *supra*. When articulating his residual functional capacity finding, ALJ Ramos substantially adopted opinions of one-time, consultative examiners, Drs. Shapiro (psychologist) and Magurno (neurologist), gave "some weight" to nonexamining consultant, Dr. Ferrin (psychologist), and "less weight" to opinions of PA Jenack, a long-term, physician's assistant who assessed Noble's mental limitations more severely.

*A.    Residual Functional Capacity*

Administrative law judges assess and articulate "residual functional capacity" before considering whether severely impaired persons can perform their prior relevant work (Step 4) or alternative available work (Step 5). This

term of art refers to what claimants can still do in work settings despite physical and/or mental limitations caused by their impairments and any related symptoms, such as pain. *See* 20 C.F.R. §§ 404.1545, 416.945. Administrative law judges thus decide whether applicants, notwithstanding their severe impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96–8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed. Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996).

When *assessing* residual functional capacity, an administrative law judge must consider "all of the relevant medical and other evidence." *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). All impairments, *i.e.*, both severe and nonsevere, must be factored into residual functional capacity determinations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945; SSR 96–8p, 1996 WL 374184, at *5. Then, when *articulating* a claimant's residual functional capacity, administrative law judges must identify and evaluate a claimant's limitations relating to specific physical and mental functions that correspond with ordinary work activities. *See* 20 C.F.R. §§ 404.1545, 416.945; *see also* SSR 96–8p, 1996 WL 374184, at *1. These functions include *physical* abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions, *mental* abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision, and *other* abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors. *See* 20 C.F.R. §§ 404.1545, 416.945; *see also* SSR 96–8p, 1996 WL 374184, at *5–6.

*B.     Treating Physician Rule*

In practice, administrative law judges rely principally on medical source opinion when assessing an impaired individual's ability to engage in work-related activities.  The Commissioner categorizes medical evidence by "sources" described as "treating,"[10] "acceptable"[11] and "other."[12]  Evidence from all three sources can be considered when determining severity of impairments and how they affect individuals' ability to function.  *See* SSR 06–03p, TITLES II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS, 2006 WL 2329939, at *2 (SSA Aug. 9, 2006) ("In addition to evidence from 'acceptable medical sources,' we may use evidence from "other sources," as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function").

---

[10]     *See* 20 C.F.R. §§ 404.1502, 416.902 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

[11]     "Acceptable" medical sources are licensed  physicians (medical or osteopathic    doctors),    psychologists,    optometrists,    podiatrists,    and speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). "Acceptable medical source refers to one of the sources described in § 404.1513(a) who provides  evidence  about  your  impairments.  It  includes  treating  sources, nontreating sources, and nonexamining sources." 20 C.F.R. §§ 404.1502, 416.902. An acceptable medical source opinion or diagnosis is necessary to establish existence of a medically determinable impairment.  SSR 06-03p, TITLES II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS, 2006 WL 2329939, at *2 (SSA Aug. 9, 2006).

[12]     "Other" sources are ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists.  20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06-03p, 2006 WL 2329939, at *2.  Evidence from these sources "is evaluated on key issues such as impairment severity and functional effects."  *Id.*, at *2-3. "Other" source opinions, even when based on treatment and special knowledge of an individual, never enjoy controlling weight presumptions. *Id.; see also* SSR 96-2p, TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, at *1 (SSA July 2, 1996) (explaining controlling-weight factors). Nor can "other" source opinion be relied upon to establish existence of a medically determinable impairment. SSR 06-03p, 2006 WL 2329939, at *2.

A "treating physician rule" requires administrative law judges to give controlling weight to opinions of treating sources regarding the nature and severity of impairments when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."[13] But, when treating source opinions swim upstream, contradicting other substantial evidence, such as opinions of other medical experts, they can be rejected.[14] A treating physician's opinion also may be discounted when it is internally inconsistent.[15] Similarly, treating source opinion can be rejected when it lacks underlying expertise,[16] is brief, conclusory and unsupported by clinical findings,[17] or appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy reasonably is suspected.[18]

State agency medical consultants are recognized experts in evaluation of medical issues in disability claims under the Act. *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). Accordingly, their opinions can constitute

---

[13]     20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *1-2; *see also Morgan v. Colvin*, No. 14-991-cv, ___Fed. App'x___, 2015 WL 668818, at *1 (2d Cir. Feb. 18, 2015); *Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

[14]     *See Williams v. Commissioner of Soc. Sec.*, 236 Fed. App'x 641, 643-44 (2d Cir. 2007)(summary order); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

[15]     *See Micheli v. Astrue*, No. 11-4756-cv, 2012 WL 5259138, at *2 (2d Cir. Oct. 25, 2012).

[16]     *See Terminello v. Astrue*, No. 05-CV-9491, 2009 WL 2365235, at *6-7 (S.D.N.Y. July 31, 2009); *Armstrong v. Commissioner of Soc. Sec.*, No. 05-CV-1285 (GLS/DRH), 2008 WL 2224943, at *11, 13 (N.D.N.Y. May 27, 2008).

[17]     *See Perez v. Barnhart*, 415 F.3d 457, 466 (5th Cir. 2005); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Alvarado v. Barnhart*, 432 F. Supp. 2d 312, 321 (W.D.N.Y. 2006).

[18]     *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *see also Labonne v. Astrue*, 341 Fed. App'x 220, 225 (7th Cir. 2009); *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

substantial evidence. *See Russell v. Colvin*, No. 5:13–cv–1030 (MAD/CFH), 2015 WL 570828, at *12-13 (N.D.N.Y. Feb. 11, 2015) ("The opinions of consultative examiners . . . may constitute substantial evidence where, as here, it is supported by the medical evidence in the record.") (citing cases). Consultative opinions can be afforded even greater weight than treating-source opinions when there is good reason to reject treating source opinion, and substantial evidence supports them. The Commissioner instructs:

> In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

SSR 96–6p, TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW, 1996 WL 374180, at *3 (SSA July 2, 1996).[19]

When controlling weight is not afforded to treating-source opinion, or when other medical opinions are evaluated, administrative judges must apply certain regulatory factors to determine how much weight, if any, to give such opinions: (1) length of treatment relationship and the frequency of examination; (2) nature and extent of treatment relationship; (3) evidence that supports a treating physician's report; (4) how consistent a treating physician's opinion is

---

[19]     *See also, e.g., Netter v. Astrue*, 272 Fed. App'x 54, 55-56 (2d Cir. 2008) (summary order); *Diaz v. Shalala*, 59 F.3d 307, 313 n. 5 (2d Cir. 1995).

with the record as a whole; (5) specialization of a physician in contrast to condition being treated; and (6) any other significant factors. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

## C.    *Noble's Challenge*

In his second point of error, Noble asserts that ALJ Ramos erred in failing to "properly follow" the treating physician rule. Noble summarizes his challenge as follows:

> Here, the ALJ unreasonably relied on opinions of non-treating physicians, failed to even assign weight to the opinions of treating physicians, and failed to give adequate weight to Plaintiff's treating physician assistant.

(Dkt. No. 14, p. 20). In a resourceful but somewhat askew argument, Noble contends that the treating physician rule was violated by (a) affording great weight to opinions of state agency consultants (Drs. Shapiro and Magurno), (b) failing to expressly weigh evidence from all treating sources (Sandra McCloy, M.D. (primary care physician) and Michael J. Small, Ph.D. (clinical neuropsychologist)) according to the six regulatory factors (described in the preceding section), and (c) failing to give great weight to PA Jenack's opinions.[20]

## D.    *Discussion*[21]

### 1.    <u>Treating Physicians</u>

ALJ Ramos did not violate the treating physician rule by failing to expressly weight evidence from treating providers Dr. McCloy and Dr. Small.

---

[20]    Noble further criticizes ALJ Ramos's passing reference to evidence provided by G. Chapla, a state agency reviewer. Although ALJ Noble expressly recognized that he legally was precluded from granting Chapla's opinions "any evidentiary weight" (T. 38), Noble argues that "any consideration whatsoever of the SDM's opinion was improper and constitutes legal error." (Dkt. No. 14, p. 20). Since ALJ Noble did not rely on this evidence, any error in the bare mention of it was harmless.

[21]    For analytical clarity, Noble's arguments are not addressed in the same order as presented in his brief.

Evidence from these two sources consisted entirely of treatment notes and psychological test results.[22] Neither source evaluated Noble's physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. As such, neither provided forensic medical opinion presumptively entitled to controlling weight or susceptible to regulatory, six-factor analysis.[23]

## 2. Physician Assistant

Noble's primary argument is that ALJ Ramos violated the treating physician rule when deciding that opinions from PA Jenack were entitled to less

---

[22] Evidence from these two sources was as follows:

*Sandra McCloy, M.D. (primary care physician)*

Dr. McCloy treated Noble following his release from the hospital after having the stroke. Dr. McCloy's treatment notes reflect that after being discharged from physical and occupational therapy, Noble wanted to return to work. (T. 415). By November 2006, Noble had returned to work. (T. 414). In a treatment note dated September 2007, Dr. McCloy noted that Noble was reporting difficulty keeping up with job demands and becoming easily distracted. (T. 413). In summer 2008, Dr. McCloy noted unresolved cognitive and functional difficulties following the CVA and referred Noble to a clinical neuropsychologist for an evaluation. (T. 457).

*Michael J. Small, Ph.D. (clinical neuropsychologist)*

Dr. Small, met with Noble on two occasions in summer of 2008, to provide a neuropsychological evaluation. (T. 457-72). He conducted numerous cognitive and intellectual tests, noting several areas of impairment ranging from mild to severe. (T. 470). Dr. Small diagnosed Noble with Major Depressive Disorder, recurrent, with Seasonal Affective Disorder; Polysubstance Dependence, in remission; Susbstance-induced Psychotic Disorder, in remission; Breathing-related Sleep Disorder (Apnea), with nightmares; Cognitive Disorder, NOS (due to CVA), with features of: spatial and geographical disorientation; executive dysfunction; reduced mental processing speed; and deficient fine motor speed and coordination. (T. 470). Dr. Small noted that "although the patient's speech is slurred, his receptive and expressive language functions are spared. In addition, may of Mr. Noble's best scores appeared on tests of learning and memory, indicating intact registration and recall." (T. 470-71). Nevertheless, Dr. Small recommended that Noble—retire from his position with BOCES. (T. 471).

[23] Noble argues that Dr. Small opined that Noble is "unable to work." (Dkt. No. 14, p. 20). This argument is factually inaccurate. Dr. Small only recommended that Noble retire from working with BOCES, and recommended, instead, that Noble function as a lay minister in his church and pursue other volunteer activities. (T. 471).

weight. Because of the emphasis given by Noble, PA Jenack's evidence is summarized as follows:

PA Jenack provided counseling to Noble for depression since 1992, continuing post-CVA. In August, 2008, PA Jenack wrote a "To Whom It May Concern" letter, commenting that Noble's "medical crisis created several deficits which grew steadily more obvious and limiting as time has gone on." (T. 448). He further opined that there are many limitations for Noble, including slurred speech, slower performance, and slower pace, and these "conditions will not likely improve significantly." (*Id.*).

In October, 2008, PA Jenack completed a New York State Office of Temporary and Disability Assistance form, noting that Noble's diagnoses were major depressive disorder and status-post CVA with symptoms of slow thought process, forgetfulness, weepy, frustrated and worried about the future. (T. 473). PA Jenack opined that the effects of the stroke worsen with time. (T. 474). PA Jenack noted that Noble had difficulty concentrating, has poor insight and judgment, partially due to diminished memory, and takes a great deal of time to adjust. (T. 476, 478). According to PA Jenack, Noble's ability to function in a work setting would be very limited. (T. 477).

In January, 2010, PA Jenack completed a Medical Report (Mental) for the Social Security Administration, opining that Noble's condition remained "guarded" and that it had been 4 years since the stroke and that Noble had recovered as much as anticipated. (T. 556). Thereafter, in September, 2010, completed another Medical Report Mental, noting a "fair" prognosis. (T. 573). PA Jenack explained that the medical condition tends to be progressive, leading to less cerebral functioning. (*Id.*). Additionally, in September, 2010, PA Jenack completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (T. 574-76). PA Jenack opined that Noble had extreme restrictions in the area of "carry out complex instruction." (T. 574). He had marked restrictions in the following areas: "understand and remember simple instructions;" "ability to make judgments on simple work-related decisions;" "understand and remember complex instructions;" and "ability to make judgments on complex work-related decisions." (*Id.*). He noted moderate restrictions in "carry out simple instructions." (*Id.*).

Physician assistants are not treating sources whose opinions presumptively are entitled to controlling weight. *See* notes 11 and 12, *supra.* As "other sources," however, their opinions "are important and should be evaluated on key issues such as impairment severity and functional effects." *See* SSR 06-3p, 2006 WL 2329939, at *3. ALJ Ramos specifically acknowledged that PA Jenack's opinions were entitled to consideration "in terms of functional limitations" (T. 36), and he summarized PA Jenack's medical evidence at length. (T. 36, 38).

Noble devotes a considerable portion of his brief to the emerging role of physician assistants in treatment and functional evaluations of patients. Noble cites SSR 06-3p wherein the Commissioner recognizes that in certain circumstances, opinions by "other" medical sources (such as a physician assistant) may outweigh opinions of "acceptable" and even "treating" sources. Noble further proffers a six-regulatory-factor assessment of PA Jenack's medical opinions, and concludes that, under proper evaluation, ALJ Ramos erred in failing to afford PA Jenack's opinions greater weight.

Noble's arguments are not without force, but, as mentioned earlier, whether substantial evidence supports Noble's view is not the question. Rather, the court must decide whether substantial evidence supports ALJ Ramos's decision, and whether ALJ Ramos applied correct principles of law.

ALJ Ramos acknowledged PA Jenack's treatment relationship with Noble (regulatory factor 2), and discussed PA Jenack's opinions at length. When deciding to give those opinions "less weight," ALJ Ramos stated:

> Less weight has been given to Mr. Jenack's . . . opinion because he is not an acceptable medical source and his opinion is inconsistent with the claimant's longitudinal medical record, including Mr. Jenack's treatment notes.

(T. 38). The first reason relates to PA Jenack's degree of expertise (regulatory factor 5). The second relates to consistency of PA Jenack's opinions with the

record as a whole (regulatory factor 4). The third reason, lack of internal consistency, relates to regulatory factors 3 and 6. This constitutes adequate compliance with the governing regulation.

Substantial evidence supports these reasons. PA Jenack, while competent to express opinions regarding functional effects of Noble's mental impairments, does not possess the same degree of specialization as acceptable medical sources such as doctors Magurno and Shapiro. No other medical source – treating, acceptable or other – opined in the longitudinal medical record that Noble's limitations are as severe as stated by PA Jenack. Treatment notes of PA Jenack report a wide range of Noble's activities such as traveling to Florida with his family (T. 568); repairing a barn (T. 565); tending to a garden (T. 588); working on the pool (T. 588); taking care of his house and children while his wife was away on business (T. 562); and considering returning to work (T. 561, 563, 578). ALJ Ramos could rationally conclude that these activities suggest that Noble is not as limited as PA Jenack opined.

Moreover, on many occasions PA Jenack noted Noble's improvement. For example, on January 24, 2010, PA Jenack noted that Noble's response to treatment was "pretty good" although he did continue to have some mood variability. (T. 556). PA Jenack further opined that Noble had "probably recovered as much as anticipated" since it had been four years since his stroke. (*Id*.). PA Jenack's treatment notes frequently indicate that Noble has continued to do "pretty well." (T. 568, 569, 578, 580, 582).

Finally, a reasonable mind might infer that PA Jenack was overly sympathetic from the fact that Noble frequently discussed status of his social security disability applications with PA Jenack (T. 557, 559, 560, 561, 562-63, 565, 566, 568, 569, 571, 577, 580, 582, 583, 584, 588, 589). PA Jenack counseled Noble to "get a hold of the [*sic*] lawyer either the legal aid or a private attorney" because "[h]e needs to have that representation in order to keep things steady"

(T. 557). PA Jenack noted "[m]y hope is that he will be able to get the disability so it's a little bit more predictable for him on the income" (T. 589), and Noble attempted to enlist his help in obtaining benefits (T. 566).

In sum, ALJ Ramos substantially complied with regulatory requirements for evaluating other source opinion; he articulated appropriate reasons for deciding to give PA Jenack's opinions less weight; and those reasons are supported by substantial evidence. He did not violate the treating physician rule or otherwise commit reversible error in weighing "other source" evidence from PA Jenack.

### 3. Consultative Opinion

Noble's objection to ALJ Ramos's reliance on one-shot consultative opinions expressed by Drs. Shapiro and Magurno is not a frivolous fabrication out of whole cloth. The Commissioner acknowledges that "objective medical findings alone or . . .reports of individual examinations, such as consultative examinations or brief hospitalizations" may not provide the unique perspective of medical evidence that a treating source can bring based on that source's detailed, longitudinal picture of a patient's medical impairments. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In addition, several courts have decried casual reliance on consultative opinion in the presence of conflicting and credible treating source opinion.[24]

_____

[24]     In *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990), the court stated:

[A] consulting physician's opinions or report should be given limited weight. . . .  This is justified because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.  Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons.

*See also Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990); *Mitchell v. Colvin*, No. 09-CV-5429 (ENV), 2013 WL 5676289, at *6 (E.D.N.Y. Oct. 17, 2013); *Minsky v. Apfel*, 65 F. Supp.2d 124, 139 (E.D.N.Y. 1999).

When considered in factual context, however, ALJ Ramos's reliance on consultative opinion was not error. First, no acceptable treating source provided opinion evidence identifying and evaluating Noble's limitations relating to specific physical and mental functions that correspond with ordinary work activities.[25] Second, while PA Jenack did provide such evidence, ALJ Ramos acted within his sound discretion in substantially rejecting PA Jenack's opinions. This, then, is a case in which the *only* assessments of Noble's work-related limitations that ALJ Ramos deemed credible came from consultative sources.

Under that circumstance, ALJ Ramos committed no legal error by relying on consultative opinion when assessing residual functional capacity. Dr. Shapiro and Dr. Ferrin are specialist experts in psychology with respect to the mental impairments. Dr. Magurno is a specialist in the field of neurology, addressing disorders of the nervous system. Their opinions are consistent with Noble's medical treatment record as a whole, including observations in treating sources' progress notes.

Noble does not identify any flaw in their assessments of Noble's limitations other than that they only examined Noble or reviewed his medical records once. This, alone, does not render their opinions infirm. As discussed in Section VI.*B*, *supra*, consultative physician's opinions may constitute substantial evidence in support of an administrative law judge's determination. *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); *see also, Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *Russell v. Colvin*, No. 5:13–cv–1030 (MAD/CFH), 2015 WL 570828, at *12-13 (N.D.N.Y. Feb. 11, 2015) ("The opinions of consultative examiners . . . may constitute

---

[25] Dr. Antoine Gabriel's opinions were rendered November, 2012 (7 months after ALJ Ramos's decision of April 2012), and contained no suggestion that his opinion related to the period at issue here. The Appeals Council rejected it because "this new information is about a later time" and "it does not affect the decision about whether you were disabled." (T. 2) Noble asserts no claim that the Appeals Council erred.

substantial evidence where, as here, it is supported by the medical evidence in the record.") (citing cases).

Opinions expressed by Doctor Magurno support ALJ Ramos's physical residual functional capacity finding. Opinions from Drs. Shapiro and Ferrin support ALJ Ramos's mental residual functional capacity finding:

*Justine Magurno, M.D. (consulting State agency examining neurologist)*

Dr. Magurno conducted a neurological examination in December 2008. Dr. Magurno diagnosed Noble with status post-CVA; diminished memory; history of diminished cognitive function; obesity; hypertension; sleep apnea; and fatigue. (T. 493). She opined his prognosis was "poor." (*Id.*).

In her Medial Source Statement, Dr. Magurno opined:

The claimant should avoid machinery, heights, ladders due to instability evidenced by diminished tandem walking. He has moderate limitations for bending. Mild limitations for speech. No other physical limitations are identified, so no limitations for walking, standing, sitting, fine motor activities, hearing, lifting, carrying, pushing pulling, and reaching.

(T. 493).

*Jeanne Shapiro, Ph.D. (consulting State agency examining psychologist)*

Dr. Shapiro performed a psychiatric evaluation and intelligence evaluation in December, 2008. (T. 480-84, 485-89). Dr. Shapiro diagnosed Noble with Cognitive Disorder, secondary to stroke; cannabis abuse, in remission; alcohol abuse, in remission; hypertension; chronic cough; sleep apnea; fatigue; and history of stroke. (T. 483). She stated that Noble's prognosis was good.

In a Medical Source Statement, Dr. Shapiro opined:

Vocationally, the claimant appears to be capable of understanding and following simple instructions and directions. He appears to be capable of performing simple and complex tasks with supervision and independently. Given his overall level of cognitive functioning, he may have difficulty with some performance tasks. He appears able to perform many tasks and can work in an appropriate setting. He appears to be capable of maintaining attention and concentration for tasks. He can regularly attend to a routine and maintain a schedule. He appears

capable of learning some new tasks. He appears to be capable of learning some tasks. He appears to be capable of making appropriate decisions. He appears to be able to relate to and interact appropriately with others. He appears to be capable of dealing with stress.

Results of the examination suggest no significant psychiatric problems. Reported psychiatric symptoms are mild and transient in nature, and not atypical for someone in his situation. There is a significant difference between his verbal and performance IQ's, probably secondary to his stroke. However he is functioning in the average range of intelligence and should be able to perform many tasks and work in an appropriate setting.

(T. 483).

### H. Ferrin, Ph.D. (State agency nonexamining/reviewing psychologist)

In January 2009, Dr. Ferrin reviewed Noble's longitudinal medical record, including reports from PA Jenack, Dr. Shapiro and Dr. Magurno. Thereafter, he completed a Psychiatric Review Technique form for the Social Security Administration, finding mild limitations in activities of daily living, social functioning, and maintaining concentration, persistence or pace. (T. 506). He found Noble had never had any episodes of deterioration for extended duration. (*Id.*).

In addition, Dr. Ferrin completed a Mental Residual Functional Capacity Assessment, finding in 16 of 20 function that Noble had "no evidence of limitation in this category," and in the remaining 4 functions "not significantly limited."

(T. 510-11).

In sum, ALJ Ramos did not err when affording great weight to consultative medical opinion under the circumstances of this case, and that opinion constituted substantial evidence supporting the residual functional capacity determination.

*E.*     *Remaining Arguments*

In his third point of error, Noble proffers a smorgasbord of additional alleged errors that he contends tainted ALJ Ramos's residual functional capacity finding.  Noble summarizes his principal arguments as follows:

> The ALJ's RFC neglected to *properly represent the evidence regarding the nature and extent of Plaintiff's limitations*; failed to *assess whether Plaintiff's obesity, singularly or in combination with the other impairments had a more than minimal effect on his ability to work*; and failed to *coincide with the opinion testimony of the VE*.  This renders the ALJ's RFC analysis both legally insufficient and not supported by substantial evidence.

(Dkt. No. 14, p. 25, emphasis added).

1.     <u>Alleged Misrepresentation of Evidence Regarding Limitations</u>

Noble pitches a misrepresentation error on arguments that ALJ Ramos (a) "cherry picked" evidence from treating neuropsychologist, Dr. Michael Small by adopting some portions of Dr. Small's opinions and disregarding other findings that demonstrated Noble's disability, and (b) failed to consider all opinion evidence from PA Jenack.  Regarding the first prong, Noble argues that Dr. Small found deficiencies indicating that Noble "was no longer able to work," but ALJ Ramos neglected to mention those findings and opinions.  Regarding the second, Noble notes (correctly) that ALJ Ramos specifically mentioned only PA Jenack's form submitted to the New York Office of Temporary Disability Assistance, and did not mention PA Jenack's voluminous treatment records, a letter concerning Noble's performance at work, and his Medical Source Statement.

Noble mischaracterizes Dr. Small's evaluation.   Dr. Small never opined that Noble is unable to work.  (T. 471).  Rather, Dr. Small recommended that Noble retire from his *current* occupation.  (*Id.*).  Dr. Small actually recommended that Noble pursue *other* vocations as a lay minister in his church and volunteer

activities. (*Id.*). ALJ Ramos, therefore, did not commit a reversible "cherry picking" error.

That ALJ Ramos did not specifically *mention* or *discuss* PA Jenack's full treatment notes, his "To Whom it May Concern" letter and his Medical Source Statement does not mean that he did not *consider* them. *See Durakovic v. Colvin*, No. 3:12–CV–6 (FJS), 2014 WL 1293427, at *8 (N.D.N.Y. Mar. 31, 2014) (citing *Barringer v. Commissioner of Soc. Sec.*, 358 F. Supp.2d 67, 79 (N.D.N.Y. 2005) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ("failure to cite specific evidence does not indicate that it was not considered."))); *accord Phelps v. Colvin*, 20 F. Supp.3d 392, 405 (W.D.N.Y. 2014). In any event, ALJ Ramos adequately explained his rationale for their implicit rejection when stating why he gave less weight to PA Jenack's opinions of Noble's functional limitations.[26]

There is no persuasive reason for finding error on the grounds of failing to consider all relevant evidence or significant mischaracterization of the evidence.

2.    Obesity

Obesity in and of itself is not a disability within the meaning of the Social Security Act. Nonetheless, administrative law judges must consider whether obesity, in combination with other impairments, prevents a claimant from working. *See* SSR 02-1p: TITLES II AND XVI: EVALUATION OF OBESITY, 67 Fed. Reg. 57,859, 57,860 (Sept. 12, 2002), *see also Dutcher v. Colvin*, No. 1:12–cv–1662 (GLS), 2014 WL 295776, at *6 (N.D.N.Y. Jan. 27, 2014). When evaluating

---

[26]    *See Mongeur*, 722 F.2d at 1040 (Where "the evidence of record permits [the court] to glean the rationale of an ALJ's decision, [the ALJ is not required to explain] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

obesity in assessing residual functional capacity, the ruling notes that obesity can cause functional limitation.[27]

Pursuant to instructions from the Appeals Council, ALJ Ramos specifically addressed Noble's obesity as follows:

> The claimant is obese. Every examiner who has offered an opinion as to his residual functional capacity has either seen him in person, made note of his weight or commented on his obesity. Absent a qualifying statement to the contrary, their opinions necessarily considered the claimant's obesity. Therefore, by weighing those opinions, the undersigned has likewise fully considered the claimant's obesity. To assign any additional limitations due to the claimant's weight would be an impermissible substitution by the undersigned of his own medical opinion.

(T. 39).

Noble cites no authority to support his assertion that this was inadequate consideration of obesity. Noble does not identify what further consideration was required. Noble points to no medical evidence indicating that he has obesity-caused functional limitations. ALJ Ramos's residual functional capacity finding restricts Noble to medium exertional work, and requires that he avoid frequent bending. Noble does not suggest that these limitations are inadequate to address whatever effects Noble's obesity may have on his ability to work.

There is no basis to declare reversible error for failure to factor obesity into the determination of Noble's residual functional capacity.

### 3. Inconsistency with Testimony from Vocational Expert

ALJ Ramos's residual functional capacity assessment imposed a limitation that Noble avoid working at heights and the use of dangerous machinery. *See* note 5, *supra.* At the March 12, 2012, evidentiary hearing, VE Schader testified

---

[27]    See SSR 02-1p, 67 Fed. Reg. at 57,862-57,863.

that a person with Ramos's residual functional capacity can engage in substantial gainful employment as a kitchen helper, dining room attendant and cleaner II. Noble's counsel sparred with VE Schader as to whether kitchen helper and cleaner II jobs would involve working with dangerous machinery and heights. VE Schader vacillated on whether dishwashers and kitchen equipment qualify as dangerous machinery. (T. 115-16).

Noble argues that ALJ Ramos's finding that Noble can perform the jobs of kitchen helper and cleaner II jobs is, therefore, inconsistent with his residual functional capacity finding. Whether or not this is the case, it does not impugn the underlying residual functional capacity finding. This argument is relevant to the subsequent Step 5 finding, and Noble proffers no point of error attacking that finding.

## VII.  Recommendation

The Commissioner's decision denying disability-based benefits should be AFFIRMED.

## VIII.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d

566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ____27____ day of ____February____ 2015.

*Earl S. Hines*

Earl S. Hines
United States Magistrate Judge